STATE OF CONNECTICUT *v.*
THADDEUS SINGLETON
(SC 17156)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued March 8—officially released July 12, 2005

*Proloy K. Das*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Toni M. Smith-Rosario*, assistant state's attorney, and *David L. Zagaja*, assistant state's attorney, for the appellant (state).

*Kirstin B. Coffin*, special public defender, for the appellee (defendant).

BORDEN, J. In this violation of probation case, the state appeals, following our grant of certification, from the judgment of the Appellate Court, reversing the judgment of the trial court, revoking the defendant's probation, on the ground that the state had not met its burden of persuasion.[1] The state claims that: (1) the case was moot when the Appellate Court decided it; (2) this court should apply the doctrine of vacatur to the Appellate Court's decision; and (3) the public interest requires that we explain why we vacate the Appellate Court's decision. We agree and, accordingly, we vacate the judgment of the Appellate Court.

The following procedural history and facts are undisputed. In May, 1998, the defendant, Thaddeus Singleton, was convicted of numerous felonies[2] and sentenced to an effective sentence of eight years imprisonment, execution suspended after three years, followed by three years of probation. On February 19, 2001, the defendant was released from prison and began his term of probation. One condition of probation was that he not violate any criminal laws of the state of Connecticut.

On June 20, 2001, the state charged the defendant, in two informations corresponding to the two judgments

---

[1] We granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the state did not meet its burden of persuasion that the defendant had violated the terms of his probation?" *State* v. *Singleton*, 268 Conn. 915, 916, 847 A.2d 312 (2004).

[2] Specifically, under Docket No. HHDCR981746T the defendant was convicted of conspiracy to commit robbery in the second degree and conspiracy to commit burglary in the second degree, and was sentenced by the court, *Clifford, J.*, to eight years imprisonment, execution suspended after three years, and three years probation. Under Docket No. HHDCR9696754T the defendant was convicted of attempt to commit assault in the first degree and was sentenced to seven years imprisonment, execution suspended after two years, and three years probation. The court ordered the sentences to run concurrently.

underlying his original convictions; see footnote 2 of this opinion; with violation of probation in violation of General Statutes § 53a-32. These charges arose out of an arrest of the defendant on June 4, 2001, which is discussed in more detail later in this opinion. After a probation revocation hearing, the trial court, *Schuman, J.*, found that the defendant had possessed an illegal substance and, therefore, had violated the terms of his probation on both informations. The court revoked the defendant's probation and committed the defendant to the custody of the commissioner of correction for the remaining five years of his original term.[3]

On April 3, 2002, the defendant filed an appeal in the Appellate Court from the judgments of the trial court. In September, 2002, the defendant filed his brief in the Appellate Court, claiming that the state had not met its burden of establishing the violation of probation. The state filed its responsive brief in December, 2002, and the defendant filed a reply brief in January, 2003. The Appellate Court heard oral argument on May 7, 2003, and on February 3, 2004, that court issued its decision, reversing the trial court's judgments for insufficient evidence and remanding the cases with direction to render judgments that the defendant was not in violation of the terms of his probation. *State* v. *Singleton*, 81 Conn. App. 409, 419, 840 A.2d 36 (2004). This certified appeal followed.

Meanwhile, on June 4, 2002, the defendant had pleaded guilty in the trial court to possession of illegal drugs with the intent to sell, based on the new criminal conduct underlying his violation of probation. The court, *Dunnell, J.*, sentenced the defendant to a period

---

[3] Specifically, on Docket No. HHDCR9696754T, the trial court committed the defendant to the custody of the commissioner of correction for five years; and on Docket No. HHDCR981746T, the trial court committed the defendant to the custody of the commissioner of correction for five years, that sentence to run concurrently with the sentence imposed in the first case.

of imprisonment of five years, the term to run concurrently with the five year term that he was serving for violating his probation in the present case. Neither the state nor the defendant, however, informed the Appellate Court of this proceeding prior to its judgment in the present case, or informed this court when we granted the state's petition for certification to appeal. We became aware of the defendant's underlying plea of guilty when the state filed its initial brief in this court.

At the probation revocation hearing, the state presented the following evidence.[4] The defendant's probation officer, Jane Driscoll, testified and introduced documents establishing that, when the defendant began his probationary term, he had signed the conditions of probation, and, on March 21, 2001, Driscoll also specifically had reviewed those conditions with him.

Timothy Mullaney, a corporal in the Plainville police department, then testified as follows. He was a Plainville police officer for seven and one-half years. He received the standard four and one-half month training program at the Connecticut Police Academy, and, in addition, received training in field narcotics and detection. This training was a one week program conducted by the Training Officers Institute of Police Management and Technology and consisted of "interview, road side interview, tactics and interrogation tactics, vehicle search and various methods to identify clues for possible drug activity while on patrol." In addition, he was trained in performing field tests for illegal drugs and had performed more than thirty such tests.

Mullaney testified further that, on June 4, 2001, at approximately 12:20 a.m., he was on routine patrol in a marked police car when he saw a white, midsize, four door vehicle turn into the parking lot of a closed

---

[4] The defendant declined to present any evidence at the probation revocation hearing.

business site. He pulled his police car into the lot and observed that all of the white vehicle's lights were off and that there were three occupants, namely, an operator, a front seat passenger and a rear seat passenger. Mullaney illuminated the vehicle with his overhead lights, exited his car and went to the vehicle to speak with the occupants. He approached the passenger side front door and asked the passenger to roll down the window so that he could speak with them. When the window rolled down slightly, Mullaney smelled the odor of marijuana. He then called for additional police units to respond and asked the occupants for identification. Only the operator of the vehicle, the defendant, complied with Mullaney's request. After the defendant handed Mullaney a Connecticut identification card with his name on it, Mullaney called in the number on the card to his dispatcher, who responded that the defendant's operating privilege had been suspended.

Meanwhile, the backup that Mullaney requested had arrived, and Mullaney then asked the defendant to exit the vehicle. Mullaney patted the defendant down and seated him in the back of the patrol car. Mullaney and the backup officer, Sandy Mattucci, then searched the car. Mattucci discovered, in the backseat of the car, a "bindle," a clear plastic baggie, containing what Mullaney believed to be crack cocaine. Mullaney performed a field test for crack cocaine,[5] and the substance tested positive for crack cocaine. Later, at police headquarters, he weighed the contents of this plastic baggie on a triple beam scale, and it weighed 14.1 grams.

In his search of the car, Mullaney also found, on the floor of the front passenger seat, a clear plastic baggie

---

[5] Mullaney described the field test in general terms as follows: Inside of a small plastic tube are caplets of different chemicals, known as "reagents." The suspected substance is put into a "tester" with the caplets, which must be broken, and the chemicals are shaken together. Depending on the substance being tested and the specific reagent being used, the mixture will then turn a specific color.

containing what appeared to be marijuana. Mullaney did not perform a field test on this substance, because the quantity was small. Also, as he was searching the car, he discovered two cell phones. When one of them rang at the scene, he answered it, and the caller asked "if he could buy an 8 ball," which, Mullaney testified, is a term for a certain quantity of cocaine.

Mullaney testified further that he placed the defendant under arrest at the scene and performed a body search of him at police headquarters. As a result of that search, Mullaney found a second bindle containing what appeared to be crack cocaine concealed in the cleft of the defendant's buttocks. Mullaney performed a field test, which was positive for crack cocaine, on that substance and also determined, using a triple beam scale, that the substance weighed 17.2 grams. Mullaney also testified that he did not send either of the bindles, which had field tested positive for crack cocaine, to the state laboratory for further testing.

On the basis of this evidence, the trial court found that the violation of probation "ha[d] been established by reliable and probative evidence and by a preponderance of the evidence and . . . satisfie[d] . . . § 53a-32 (b) . . . ." In support of this finding, the court stated further: "I think it's more likely than not that the substance seized from the defendant was . . . crack cocaine. The field test indicated it and there is no indication that the field test was not working properly. But there are other circumstantial factors that corroborate the field test results. The defendant was in the presence of two other individuals from whom or from nearby whom drugs were also seized. There was the smell of marijuana that the officer observed when the window began to open. That confirms that these individuals were there for the purpose of drug use or possibly distribution.

"In addition, there was the telephone call with a person seeking to buy an 8 ball, which confirms . . . what was going on here involved drugs and, finally, that the location that this particular item was found, in the cleft of the defendant's buttocks, is highly corroborative of the field test. It's hard to imagine anything else being concealed there except something that the defendant wanted to hide from law enforcement authorities.

"So, I believe that, more probably than not . . . the defendant was in possession of a controlled substance. The amount in particular being more than one-half ounce does suggest distribution as well, along with the amount of the other piece of crack cocaine seized and the telephone call, although it's not necessary to find that there was distribution for purposes of the violation. So, for those reasons, I do find the defendant in violation."

On appeal to the Appellate Court, the defendant argued, as he had in the trial court, that the state had not met its burden of establishing a violation of probation. That court agreed. *State* v. *Singleton,* supra, 81 Conn. App. 410.

The Appellate Court first noted that, essential to the court's finding by a preponderance of the evidence that the defendant had possessed crack cocaine "was the result of the field tests that Mullaney performed on the substance found on the defendant." Id., 414. It noted further that "an unknown substance that appears in the exhibits as small tan crumbs tested positive as crack cocaine in a field narcotics test." Id. The court then gave what it stated is the undisputed meaning in the scientific community of crack cocaine, as follows: "[T]he meaning of the base form of cocaine [or crack cocaine] is undisputed in the scientific community. . . . [It is] a substance which when combined with an acid produces a salt. . . . [T]he chemical formula for

cocaine base is $C_{17}H_{21}NO_4$; the formula for cocaine hydrochloride—a chemical term for [powder] cocaine—is $C_{17}H_{21}NO_4HCl$. . . . [T]he two forms have different solubility levels, different melting points and different molecular weights. . . . [J]ust about any chemical laboratory would be able to distinguish the difference between cocaine base and cocaine salt or other forms." (Internal quotation marks omitted.) Id., 414–15.

The court then stated that "[i]n this case, there was no evidence as to the identity and reliability of the field test. The only reference to the identity of the field test at the hearing was a statement by the defendant's counsel during closing argument, which is not evidence. The test was described by counsel as a 'narcotic thirteen' field test." Id., 415–16. The court noted in this regard that Mullaney's police report, which was not in evidence but which was submitted with the application for the violation of probation arrest warrant, referred to the test as a " 'Nark #13 test.' " Id., 416 n.1

The Appellate Court then stated that "the literature reveals that field tests are not designed or marketed for qualitative analysis of suspected narcotics." Id., 416. The court stated: "Matt Johnson, a narcotics investigator who has taught numerous narcotics field test seminars nationwide, has written that a blue presence after applying cobalt to the tested substance, indicating a positive field test reaction for crack cocaine, occurs not only with crack cocaine, but also with several other nonillicit substances, such as Benadril. M. Johnson, 'Narcotic Field Testing,' Law & Order (June, 2003).

"The manufacturer of the 'Nark Reagent No. 13' presumptive test for crack cocaine states in its catalog: 'Presumptive identification is generally recognized within our legal system as a component of probable cause. There is no drug identification system presently

in use which completely eliminates the occurrence of false positives and false negatives. A forensic laboratory is required to qualitatively identify an unknown substance.' Sirchie Finger Print Laboratories On-Line Catalog at http://www.gsa-sales.com/sirchie/sir-18-19.htm. In its spring, 1999 newsletter, ODV, Inc., another manufacturer of field tests, also states that 'field tests are designed to confirm your probable cause evidence.' See http://www.ODVINC.com.

"There was also no evidence as to the nature of Mullaney's training and the use of that training in conducting the field tests in this case. Johnson cautions that officers should be trained to perform the field test exactly as prescribed to avoid being misled by a false positive. M. Johnson, supra, Law & Order. ODV, Inc., counsels in a similar vein in its spring, 1997 newsletter. See http://www.ODVINC.com." *State* v. *Singleton*, supra, Conn. App. 416–17.

The court then specifically rejected "the position advocated by the state that the officer's field test in this case was sufficient proof by a preponderance of the evidence that the substance contained illegal narcotics. Although there were facts to support probable cause, we conclude that there was not reliable evidence to support a finding by a fair preponderance of the evidence that the hidden substance was in fact crack cocaine, a narcotic drug." Id., 417.

Finally, the court stated: "The substance that the defendant possessed was readily available for a laboratory analysis to determine whether it in fact contained cocaine, a narcotic. After such testing, the true nature of the unknown substance could have been determined and served as a reliable basis to find, by a fair preponderance of the evidence, that the defendant illegally had possessed narcotics. In the absence of reliable evidence

as to the illicit nature of that substance, we must reverse the judgments of the trial court." Id., 419.

## I

## MOOTNESS

We first address the question of mootness because it implicates both the subject matter jurisdiction of the Appellate Court when it decided this case and of this court. *State* v. *McElveen*, 261 Conn. 198, 201, 802 A.2d 74 (2002). It is clear that, because the defendant pleaded guilty to and was convicted of criminal conduct "stemming from the same criminal conduct that gave rise to the violation of his probation," his appeal from the trial court's judgment revoking his probation was moot when the Appellate Court decided that appeal because there was no controversy left regarding whether he had engaged in the criminal conduct for which his probation had been revoked. Id., 216–18. Thus, the Appellate Court did not have subject matter jurisdiction over the defendant's appeal, despite the fact that it was ignorant of that conviction. Similarly, the state's appeal in this court is moot for the same reason, namely, there remains no live controversy over whether the defendant engaged in that conduct and, therefore, the appeal must be dismissed. Id.

The defendant contends, however, that the case is not moot because if we were to affirm the Appellate Court judgment reversing the judgment of violation of probation, that would afford him the practical relief of removing from his record "a mark that would otherwise impact his ability to obtain probation in the future and affect his reputation in the community." For this proposition, the defendant relies on this court's decision in *State* v. *Daniels*, 248 Conn. 64, 72–73, 726 A.2d 520 (1999). This contention requires us to resolve a tension between *McElveen* and *Daniels*, and to conclude that an aspect of *Daniels* must be overruled.

In *Daniels*, which was decided in 1999, the defendant appealed from the trial court's judgment of violation of probation and sentence of thirty-three months incarceration of a three year period of incarceration that had been previously imposed and suspended. Id., 69. During the pendency of his appeal, however, the defendant pleaded guilty, under the *Alford* doctrine,[6] to burglary in the third degree involving the same conduct that underlay the violation of probation. Id. The state argued that the defendant's subsequent plea of guilty rendered his appeal from the violation of probation moot. Id. We concluded that the defendant's appeal was not moot because, if he were to prevail, practical relief could be afforded in the form of a potentially different sentence of incarceration upon the remand for a new violation of probation hearing. Id., 73. We did not address, however, the question of whether, despite the presence of potential practical relief, the appeal was nonetheless moot because there was no longer a live controversy over whether the defendant had engaged in the conduct that underlay the violation of probation. Nonetheless, because we had concluded that the appeal was not moot and that, therefore, we had subject matter jurisdiction over the appeal, we then went on to decide certain of the defendant's appellate claims. Id., 73–81.

Three years later, in 2002, we decided *State* v. *McElveen*, supra, 261 Conn. 198. In that case, the defendant appealed from a judgment of violation of probation and sentence to incarceration for six months of a one year period of incarceration that previously had been imposed and suspended. Id., 203. While his appeal was pending, however, the defendant pleaded guilty to criminal charges arising out of the same conduct for which the trial court had found him in violation of probation, and sentenced him to five years incarceration, execu-

---

[6] *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

tion suspended after six months, concurrent with his sentence for violation of probation. Id., 201 n.3. Furthermore, by the time that the appeal was heard in this court, the defendant had completed serving his sentence for violation of probation. Id.

On this set of facts, we first addressed the question of whether the appeal was moot because of the expiration of the defendant's sentence for violation of probation. Id., 204. We concluded that the defendant's appeal was not moot for *that* reason because of two potential collateral consequences of a finding of violation of probation: (1) future difficulty in obtaining a favorable decision concerning preconviction bail; and (2) diminished standing in the community, manifested, for example, in increased difficulty in securing employment. Id., 213–16.

We then turned, however, to a second aspect of mootness, namely, whether, despite the potential practical relief of collateral consequences, the appeal was moot, nonetheless, because there no longer remained "an actual controversy between or among the parties to the dispute . . . ." (Internal quotation marks omitted.) Id., 217. In that respect, we concluded that the appeal was moot because "there no longer exists a 'controversy' about whether [the defendant] committed the criminal conduct that gave rise to the violation of probation." Id. For *that* reason, the appeal was moot and had to be dismissed. Id., 218.

It is apparent that, although the first part of the mootness analysis in *McElveen* was consistent with the analysis in *Daniels*, the second part cannot be reconciled with *Daniels*. We, therefore, overrule the conclusion in *Daniels* that a subsequent conviction of criminal conduct arising out of the same facts underlying a violation of probation does not render the appeal from the violation of probation moot. So that there will be no

confusion, we reiterate our holding in this case, which is consistent with that in *McElveen*: Where, subsequent to a finding of violation of probation, a defendant is criminally convicted for the same conduct underlying the violation of probation, his appeal from that judgment of violation of probation is rendered moot because there is no longer any live controversy about whether he engaged in the conduct for which his probation was violated.

## II

## VACATUR

The state asks us, moreover, not only to decide that the case is moot, but to issue an order of vacatur of the Appellate Court's judgment and to explain why we do so. We agree with the state that, in the present case, it is appropriate that we both vacate that judgment and briefly explain why.

Our law of vacatur is scanty and has been developed entirely in the context of civil litigation. See *In re Candace H.*, 259 Conn. 523, 526–27, 790 A.2d 1164 (2002) (respondent mother of minor child in custody of department of children and families appealed to Appellate Court from denial of motion for visitation with child; Appellate Court reversed in part; while certified appeal of department of children and families pending in this court, respondent voluntarily relinquished parental rights to child; certified appeal dismissed as moot, and Appellate Court judgment vacated because public interest served, so as to prevent judgment, unreviewable because of mootness, from spawning legal consequences); *In re Jessica M.*, 250 Conn. 747, 748–49, 738 A.2d 1087 (1999) (trial court dismissed petition of commissioner of children and families for termination of parental rights; Appellate Court affirmed; while certified appeal of commissioner of children and families pending in this court, trial court granted commissioner's

subsequent petition for termination, which was not appealed; certified appeal dismissed as moot, and judgment of Appellate Court vacated based on established federal practice that, when appeal rendered moot through no fault of parties, motion to vacate judgment under appeal granted); *Commissioner of Motor Vehicles* v. *DeMilo & Co.*, 233 Conn. 254, 269–71, 659 A.2d 148 (1995) (relationship between vacatur and res judicata where appeal dismissed as moot); see also *Taft* v. *Wheelabrator Putnam, Inc.*, 255 Conn. 916, 917–18, 763 A.2d 1044 (2000) (*McDonald, C. J.*, dissenting) (court must consider actions of parties in determining if vacatur appropriate).

Without attempting to formulate any overall set of guidelines for vacatur of judgments of the Appellate Court in criminal cases, we gain guidance from the general proposition that vacatur is appropriate when it is in the public interest to prevent a judgment, otherwise unreviewable because of mootness, from spawning legal consequences. *In re Candace H.*, supra, 259 Conn. 527. We conclude that this standard applies to the present case.

We acknowledge that when a court dismisses a case for lack of subject matter jurisdiction, any further discussion of the merits of that case is dicta. *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 234 Conn. 624, 649 n.23, 662 A.2d 1251 (1995). Nonetheless, we comment on the merits of the present case because, when we exercise our power to vacate a judgment in the public interest, we have the power to explain why we deem it necessary to do so. It is appropriate to exercise that power in the present case to make clear that the opinion of the Appellate Court should not be followed in future cases. Briefly stated, we disagree with the Appellate Court's conclusion that, under the circumstances of the case, there was not sufficiently reliable evidence to support the trial court's finding, by

a preponderance of the evidence, that the substance seized from the defendant was crack cocaine.

The field test performed by Mullaney was positive for crack cocaine, and there was no evidence to undermine the reliability of that field test. Furthermore, there were numerous other facts that corroborated the reliability of the test, namely, that: the defendant was with two others from whom or nearby whom drugs were seized; there was the smell of marijuana in the car; a telephone call came in to one of the two cell phones in the car from someone seeking to buy cocaine; and the substance was hidden in the cleft of the defendant's buttocks, an unlikely place for carrying a legal substance.

The Appellate Court focused on several factors for its contrary conclusion: (1) the lack of evidence of the reliability of the type of field test used; (2) the potential for false positives of the test; (3) the lack of evidence of the nature of Mullaney's training; and (4) the lack of a laboratory test, which would have been conclusive. These factors did not, however, undermine, as a matter of law, the assessment by the trial court that the evidence that *was* produced persuaded it by a preponderance of the evidence that the field test was reliable. The first two factors went only to the weight of the evidence, which was a matter within the fact-finding function of the trial court. As for the third factor, there was evidence that Mullaney had been trained in performing field tests and had conducted more than thirty such tests, and Mullaney testified as to how the tests were performed in the present case. As for the fourth factor, although both this court and the Appellate Court have sustained criminal convictions of possession of illegal drugs where the nature of the substance was based on positive field tests; see *State* v. *Synakorn*, 239 Conn. 427, 435–37, 685 A.2d 1123 (1996) (positive field test for marijuana); *State* v. *Lee*, 53 Conn. App.690,

692–95, 734 A.2d 136 (1999) (positive field test for crack cocaine); we need not decide in the present case whether a field test alone would be sufficient to establish, beyond a reasonable doubt, that the substance tested was crack cocaine. In the present case, the evidence of the field test, in conjunction with the corroborating evidence, was sufficient to establish the nature of the substance by a preponderance of the evidence.

The appeal is dismissed and the judgment of the Appellate Court is vacated.

In this opinion the other justices concurred.