# STATE OF CONNECTICUT *v.* ANTHONY MARTINEZ
## (AC 32879)

DiPentima, C. J., and Beach and Bishop, Js.

Argued January 4—officially released June 25, 2013

*Alice Osedach,* assistant public defender, for the appellant (defendant).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *John C. Smriga,* state's attorney, and *Nicholas J. Bove, Jr.,* senior assistant state's attorney, for the appellee (state).

### Opinion

BISHOP, J. The defendant, Anthony Martinez, appeals from the judgment of conviction, rendered following a jury trial, of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a) and conspiracy to possess narcotics with intent to sell in violation of General Statutes §§ 53a-48 (a) and 21a-277 (a). The defendant claims that (1) there was insufficient evidence to prove that he committed the crimes of possession of narcotics with intent to sell and conspiracy to possess narcotics with intent to sell; (2) the trial

court improperly admitted testimony regarding narcotics field test results without a *Porter*[1] hearing; and (3) prosecutorial impropriety deprived him of a fair trial. We agree with the defendant's claim of prosecutorial impropriety, and, therefore, reverse the conviction on both counts and remand the case for a new trial. We also address the merits of the defendant's second claim because it is likely to arise on retrial.

The jury reasonably could have found the following facts. On June 2, 2009, Lieutenant Christopher LaMaine, of the Bridgeport police department, was conducting an investigation into suspected drug activity at a particular residence in Bridgeport. While conducting surveillance of the residence, LaMaine observed two individuals, later identified as Javier Nevarez and Camilla Blakes, approach the residence in what he concluded was an attempt to purchase narcotics. Nevarez and Blakes left the residence without engaging in a drug transaction and, instead, drove their car to Washington Park in Bridgeport, an area known for drug activity. LaMaine followed Nevarez and Blakes and parked his surveillance van on the edge of the park. From the backseat of the van, through tinted windows, LaMaine watched Nevarez and Blakes approach a male who directed them to a bench farther into the park. The defendant and Maria Vargas were sitting on that park bench with their backs toward LaMaine.

Eighty-two yards away from the bench where the defendant and Vargas were sitting, LaMaine used binoculars to view the scene. He testified that the defendant and Vargas sat next to each other, almost shoulder to shoulder, with the defendant on the right side of the bench and Vargas in the middle. Nevarez and Blakes

---

[1] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

approached the defendant, and Nevarez and the defendant appeared to speak briefly. The defendant and Vargas both then looked down at a common point in their laps. Although LaMaine could not see their hands, laps, or what they were looking at, from the way they both turned toward each other and down, LaMaine believed that the defendant and Vargas appeared to exchange something. The defendant then reached up to a point at which his hand was visible to LaMaine, and LaMaine observed him appear to exchange something with Nevarez. Nevarez and Blakes then turned and walked back toward their vehicle and as Nevarez walked, he inspected something in his hand, cupping it in one palm and poking it with his other finger, consistent, according to LaMaine, with an inspection of drugs.

After Nevarez and Blakes left the bench, a second man approached the defendant and another apparent exchange took place between the defendant and Vargas, and then between the defendant and the second man, in the exact same manner that had occurred with Nevarez. The second man walked away and was never identified or apprehended. As Nevarez and Blakes got back into their car, LaMaine radioed nearby officers to stop the car to check for narcotics. As the officers were approaching, Nevarez and Blakes pulled the vehicle over and parked. Officer Gregory Iamartino, who was driving an unmarked vehicle, exited his vehicle and went to the driver's side of Nevarez' car. When Nevarez noticed Iamartino, he placed an item into his mouth and swallowed it. Iamartino saw a glass crack pipe and two small bags of what appeared to be crack cocaine in the center console of the vehicle between Nevarez and Blakes. Iamartino relayed back to LaMaine that the car was stopped and suspected narcotics were seized.[2]

[2] At the time of the stop, both Nevarez and Blakes made incriminating statements about purchasing the narcotics. Those statements were not introduced at trial because the witnesses were unavailable, and the court granted the defendant's motion in limine on the ground that introduction of the statements would violate the defendant's sixth amendment rights to confron-

A subsequent field test performed by Officer Nicole Donawa yielded a positive result for the presence of crack cocaine and heroin in the drugs found in the car.

LaMaine called in additional units of the narcotics team, which then entered Washington Park and arrested the defendant and Vargas. When officers approached the defendant, he did not attempt to run away or resist arrest, and no contraband was found on him.[3] Officer Barbara Gonzalez searched Vargas and, after noticing the top of a plastic bag sticking out of the top of her pants, discovered a plastic bag containing what appeared to be small parcels of narcotics concealed in her pants. Gonzalez also found $25 on Vargas. The substances in the bags were field tested and subsequently sent to the state controlled substance toxicology laboratory where the substances tested positive for cocaine and heroin.

The state charged the defendant by way of an amended information with one count of possession of narcotics with intent to sell in violation of § 21a-277 (a), one count of possession of narcotics with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b), one count of conspiracy to possess narcotics with intent to sell in violation of §§ 53a-48 (a) and 21a-277 (a), and one count of conspiracy to possess narcotics with intent to sell within 1500 feet of a school in violation of § 21a-278a (b). At the close of evidence, the defendant moved for a judgment of acquittal on the ground that the state had not proven the charges beyond a reasonable doubt. It was denied.

---

tation under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[3] At the time of his arrest, the defendant was found to have $60 in cash on his person. Evidence of this money was suppressed by the court in response to the defendant's motion in limine and, accordingly, the jury heard no evidence during trial that this sum had been discovered on the defendant's person.

After closing arguments, the defense moved again for a judgment of acquittal or for a new trial. The court also denied both motions. Following deliberations, the jury found the defendant guilty on the counts of possession of narcotics with intent to sell and conspiracy to possess narcotics with intent to sell, and not guilty on the counts related to being within 1500 feet of a school. The trial court, after accepting the jury's verdict, sentenced the defendant to concurrent terms of twelve years incarceration on the possession and conspiracy counts, execution suspended after five years, with five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant's first claim challenges the sufficiency of the evidence at trial to sustain his conviction of possession with intent to sell and conspiracy to possess with intent to sell. Specifically, the defendant argues that there was insufficient evidence that he ever had dominion or control over the narcotics discovered on Vargas' person or that he had an agreement with Vargas to possess the narcotics with the intent to sell. We begin this analysis with a discussion of the law regarding sufficiency of the evidence before turning to an assessment of the defendant's claims as they relate to the possession and conspiracy charges.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Martin*, 285 Conn. 135, 147–48, 939 A.2d 524, cert.

denied, 555 U.S. 859, 129 S. Ct. 133, 172 L. Ed. 2d 101 (2008).

## A

We first address the defendant's claim that the state failed to present sufficient evidence that the defendant possessed the narcotics found on Vargas' person. He argues that the jury reasonably could not have concluded without improper speculation that he exercised dominion or control over the drugs. We disagree.

"In order to prove that a defendant is guilty of possession of narcotics with intent to sell, the state must prove beyond a reasonable doubt that the defendant had (1) either actual or constructive possession of a narcotic substance and (2) the intent to sell narcotics." *State* v. *Billie*, 123 Conn. App. 690, 694 n.7, 2 A.3d 1034 (2010). It is clear that "[t]o prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . Where . . . the [narcotics were] not found on the defendant's person, the state must proceed on the theory of constructive possession . . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." (Internal quotation marks omitted.) *State* v. *Fair*, 118 Conn. App. 357, 362, 983 A.2d 63 (2009).

The defendant argues that the jury could not have concluded, without speculation, that he ever was in possession of the drugs found on Vargas' person in light of LaMaine's testimony that he could not see Vargas' and the defendant's hands or their laps, that he could not see what they were doing with their hands as they moved them, that he could not see if the defendant had anything in his hands and that he could not see whether Vargas gave anything to the defendant. At the outset, we acknowledge, as the state must as well, that there is no evidence that LaMaine actually saw the defendant take the drugs from Vargas. To prove the possession count, however, the state was proceeding "on the theory of constructive possession, that is, possession without direct physical contact. . . . Constructive is an adjective used to describe something tantamount to or the equivalent of the actual quality or characteristic of the noun it modifies. Actual possession rests on legal title or direct physical contact as opposed to the legal fiction of constructive possession that can be inferred from the circumstances and can be the equivalent of actual possession. . . . In other words, a person may be in constructive possession of something although *he has no physical contact with it* or legal title to it." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Williams*, 110 Conn. App. 778, 787, 956 A.2d 1176, cert. denied, 289 Conn. 957, 961 A.2d 424 (2008).

In this case, the cumulative evidence adduced by the state allowed the jury to make a permissible inference of the defendant's knowledge and control of the drugs. The jury heard the testimony of LaMaine, an experienced police officer who has made thousands of narcotics arrests, who explained that the defendant's and Vargas' coordinated movements on the bench, followed by an exchange with Nevarez, were consistent with the behaviors of drug sellers and purchasers. LaMaine

testified that the defendant's movements were that of "a quick hand-to-hand that was very typical of a drug deal." That evidence, together with the evidence of the other, similar transaction with the second man, could reasonably have informed the jury's understanding that the defendant's and Vargas' movements on the bench were to facilitate the transfer of drugs from Vargas to the defendant and then to Nevarez and the second purchaser. Additionally, Nevarez' behavior of cupping his hand and inspecting it as he moved away from the bench provided further support for the reasonable inference that an item was passed from the defendant to Nevarez.

The defendant argues that because LaMaine admitted on cross-examination that he was "speculating" about whether the defendant and Vargas actually exchanged the drugs, the jury must have improperly speculated to reach that conclusion as well.[4] The jury, however, was

---

[4] The defendant also raises several other issues regarding sufficiency, such as that he could have sold Nevarez a fake "beat bag," that Nevarez could have had the two bags in the car before he entered the park and that it would have been an improper inference for the jury to connect the defendant to the narcotics by finding that he exchanged them with Nevarez because the substances found in Nevarez' possession were never conclusively proven to be narcotics by a laboratory analysis.

As we have already noted, "[i]n evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Citation omitted; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 146–47, 869 A.2d 192 (2005). Thus, while the evidence that Nevarez had possession of drugs tends to buttress the inference that Vargas passed the drugs to the defendant, who, in turn, exchanged them with Nevarez, the jury did not need to conclude beyond a reasonable doubt that Nevarez was in possession of drugs to conclude that the defendant had constructive possession of the drugs on Vargas' person. We also point out that the defendant was not charged with possession of the drugs that were found in Nevarez' possession, but instead, the state had to prove only

free to credit that LaMaine's "speculation" was, in fact, based on his training and experience. "It is axiomatic [however] that it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Osbourne*, 138 Conn. App. 518, 533–34, 53 A.3d 284, cert. denied, 307 Conn. 937, 56 A.3d 716 (2012). While we recognize that this evidence is largely circumstantial, we note that, "[i]n the review process, the probative force of the evidence is not diminished if it consists in whole or part of evidence that is circumstantial rather than direct." *State* v. *Boykin*, 27 Conn. App. 558, 563, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992). On the basis of all the evidence, we conclude that there was a sufficient, albeit circumstantial, factual nexus between the defendant and the drugs found on Vargas' person to convict him of possession.

## B

We next address the defendant's claim that the state failed to present sufficient evidence to permit the inference that the defendant conspired with Vargas to possess the narcotics with intent to sell. The defendant argues that there was no evidence that he had an agreement with Vargas or that he committed an overt act necessary to sustain a conspiracy conviction. We disagree.

that the defendant had the requisite knowledge and control of the drugs found on Vargas' person in order to find him in possession. Additionally, the defendant does not challenge that the state sufficiently proved that the substances found on Vargas' person were heroin and cocaine when it introduced testimony about the laboratory analysis. We further address the defendant's claim surrounding the reliability of the field tests in part II of this opinion.

With respect to the charge of conspiracy to possess narcotics with intent to sell under § 53a-48 (a), "the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . The conspiracy may be proved through circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Rouleau*, 204 Conn. 240, 258, 528 A.2d 343 (1987). "The existence of a formal agreement between the parties, however, need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of conspiracies, a conviction is usually based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words 'we have an agreement.' . . . Indeed, a conspiracy can be inferred from the conduct of the accused." (Citations omitted.) *State* v. *Boykin*, supra, 27 Conn. App. 564–65.

We conclude that the state presented sufficient evidence upon which the jury reasonably could have found the defendant guilty of the conspiracy beyond a reasonable doubt. The defendant's close proximity to Vargas throughout the surveillance and their suspicious movements on the park bench, coupled with his conversations and exchanges with Nevarez and the second man "support the inference that the defendant associated himself with the venture in some fashion, participated in it as though it was something he wanted to bring about or sought by his actions to make succeed." Id., 566. The defendant's actions of turning to Vargas after conversing with both Nevarez and the second man, and then turning back to engage in what LaMaine, based

on his training and experience, concluded were drug exchanges, further buttress the inference that he and Vargas were partners in the crime. As we have already concluded, the jury reasonably could have found that the defendant possessed the drugs found on Vargas' person and, "[a]s to the overt act, [p]ossession of the drugs is sufficient for proof of the overt act in a conspiracy." (Internal quotation marks omitted.) *State* v. *Straub*, 90 Conn. App. 147, 155, 877 A.2d 866, cert. denied, 275 Conn. 927, 883 A.2d 1252 (2005). From this evidence, the jury reasonably and logically could have inferred that the defendant was a willing and active participant in a conspiracy to possess the cocaine and heroin with intent to sell.

II

The defendant next claims that the court improperly admitted testimony about the results of the narcotics field tests taken on the substances found in Nevarez' car. The defendant claims that the court abused its discretion in admitting such evidence without a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), because the field test is not a scientifically proven and reliable method to prove that a substance is a narcotic. We agree with the defendant that the court should have held a *Porter* hearing, but ultimately conclude that this error was harmless.

The following additional facts are relevant to the discussion of this claim. Prior to trial, on April 12, 2010, the defendant filed a motion in limine seeking to preclude the state from introducing into evidence the results of field tests conducted on the drugs found in Nevarez' car.[5] The defendant also sought a hearing pursuant to *Porter*, arguing that the methodology underlying the field tests has not been established as

_____

[5] Unlike the substances found on Vargas' person, which were field tested and then sent to the state laboratory for further analysis, the substances from Nevarez' car were never tested at the laboratory, apparently because

scientifically valid. On April 13, 2010, the court heard argument on the motion in limine and reserved judgment until it heard the state's offer of proof.

On the next day, April 14, 2010, the state offered the testimony of Donawa to lay a foundation for the evidence outside the presence of the jury. Donawa testified that she had been trained in drug identification and testing at the police academy, was instructed by a field training officer and had performed at least fifty tests prior to the test on the items seized from Nevarez' car. Donawa further testified that the procedure is to place a sample of the substance into a tube, break capsules containing "some sort of acidic liquid" inside the tube, and confirm whether the resulting color the substance turns matches the color on the cap of the tube or box of the test. Donawa explained that if the color is a match, it is considered a positive result for the presence of the narcotic. Donawa identified two sample field testing kits, one to test for the presence of crack cocaine and one for heroin. Donawa testified that she did not have any training in pharmacology, toxicology, biochemistry or any other related field and was unable to explain the chemical reactions that caused the substance to change color. In response to the court's inquiry whether there was a police department procedure on how to conduct the field tests, Donawa explained that once the test is conducted, she informs the case officer of the test results and secures the evidence in an evidence bag with a piece of red tape tying the sample to its positive field test. Donawa testified that she followed this procedure for the field tests on the items seized from Nevarez' car.

the laboratory was in the process of moving during this time. The record reflects that the state originally charged the defendant with the sale of the narcotics related to the substances found in Nevarez' car, but, in light of the failure to have these items laboratory tested, the state determined only to go forward with the possession and conspiracy charges relating to the narcotics found on Vargas.

After further argument, the court denied the motion in limine, stating that no *Porter* hearing was required because the field testing involved an established procedure, that Donawa had followed the established procedure and that she had performed many such tests previously. In its articulation dated February 29, 2012, the court further explained that it found that the defendant had failed to show that field tests involved an innovative scientific technique requiring a *Porter* hearing and that any lack of reliability or incidences of false positives went to the weight of the evidence, not the admissibility, and further, the state was relying on the substances found on Vargas' person for the substantive possession charges, which the state laboratory confirmed tested positive for cocaine and heroin. The court also found that the testimony concerning the results of the field test was more probative than prejudicial and was, accordingly, admissible.

At trial, Donawa explained the procedure she used for the field tests and testified that the drugs seized from Nevarez' car tested positive for cocaine and heroin. On cross-examination, she testified that she had not been trained by or received the narcotics field test training certificate from the manufacturer of the field test kits. She further testified that the field tests are referred to as presumptive tests because the police still have to forward the sample to the laboratory "to be absolutely certain." Donawa also agreed that the tests can produce false positives and that it is the regular practice to send the items to be tested at the state laboratory by a toxicologist.

Additionally, during the cross-examination of Laura Grestini, a chemist for the department of public safety, division of scientific services, controlled substance toxicology laboratory, defense counsel asked her several questions regarding field tests. Grestini explained that a presumptive test is one that concludes whether a

substance could be a drug or could not be a drug and, "[i]f it's positive, it's only a presumptive positive that says that it might be whatever it happens to be positive for." She further explained that she would never form an opinion as to what something could be based only on a presumptive field test.

Our standard of review is well established. "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence. . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Because a trial court's ruling under *Porter* involves the admissibility of evidence, we review that ruling on appeal for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Legnani*, 109 Conn. App. 399, 418, 951 A.2d 674, cert. denied, 289 Conn. 940, 959 A.2d 1007 (2008). Accordingly, we must determine whether the trial court abused its discretion in determining that a *Porter* hearing was not required and, if so, we must also determine whether this ruling was nevertheless harmless.

## A

"In *State* v. *Porter*, [supra, 241 Conn. 57], our Supreme Court adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In so doing, the court noted two threshold requirements to the admissibility of scientific evidence. First, that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement

establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity. . . . Second, the scientific evidence must fit the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . .

"Although the Supreme Court in *Porter* established the requirements for the admissibility of scientific evidence, it did not define what constituted scientific evidence, thereby allowing the courts to maintain some flexibility in applying the test. As a result, a court's initial inquiry should be whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*. . . . In *Porter*, our Supreme Court noted that some scientific principles have become so well established that an explicit . . . analysis [under *Daubert*] is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand a *Daubert* analysis, and thus may be admitted simply on a showing of relevance." (Citations omitted; internal quotation marks omitted.) *Milton* v. *Robinson*, 131 Conn. App. 760, 770–71, 27 A.3d 480 (2011), cert. denied, 304 Conn. 906, 39 A.3d 1118 (2012).

"Although this court in *Porter* explicitly adopted the *Daubert* test to determine the admissibility of scientific evidence; see *State* v. *Porter*, supra, 241 Conn. 68; we did not explicitly overrule Connecticut precedent regarding the evidence to which such a test should apply. Prior to *Porter*, this court had recognized that the *Frye*[6] test for admissibility should not apply to all expert testimony, but only to that which involves innovative scientific techniques . . . . *State* v. [*Borrelli*], 227 Conn. 153, 163, 629 A.2d 1105 (1993); *State* v. *Hasan*, 205

---

[6] See *Frye* v. *United States*, 294 F. 1013 (D.C. Cir. 1923).

Conn. 485, 489, 534 A.2d 877 (1987). In *Porter* we recognized that *Daubert*'s vagueness as to how and when to apply the factors of the test was necessary. *State* v. *Porter*, supra, 78. In order to maintain flexibility in applying the test, we did not define what constitutes scientific evidence. . . . Consequently, our initial inquiry is whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*." (Citations omitted; internal quotation marks omitted.) *State* v. *Griffin*, 273 Conn. 266, 276, 869 A.2d 640 (2005).

Since *Porter*, there have been two lines of cases in which our courts have determined that a *Porter* hearing is unnecessary. See *Maher* v. *Quest Diagnostics, Inc.*, 269 Conn. 154, 170 n.22, 847 A.2d 978 (2004) (discussing first line of cases and noting second set). In one line of cases, "we have concluded that certain forms of scientific evidence have become so well established that a formal *Porter* inquiry is rendered unnecessary . . . ." Id., 170; see *State* v. *Porter*, supra, 241 Conn. 85 n.30, citing *State* v. *Cline*, 275 Mont. 46, 55, 909 P.2d 1171 (1996) (ordinary fingerprint identification evidence); see also *Hayes* v. *Decker*, 263 Conn. 677, 687–89, 822 A.2d 228 (2003) (effects of discontinuation of blood pressure medication); *State* v. *Kirsch*, 263 Conn. 390, 405, 820 A.2d 236 (2003) (reliability of alcohol blood testing done at hospital well established); *State* v. *Legnani*, supra, 109 Conn. App. 418–21 (matching of fired cartridges to magazines on basis of magazine marks). In the second line of cases "we have concluded that certain types of evidence, although ostensibly rooted in scientific principles and presented by expert witnesses with scientific training, are not 'scientific' for the purposes of our admissibility standard for scientific evidence, either before or after *Porter*." *Maher* v. *Quest Diagnostics, Inc.*, supra, 170 n.22; see *State* v. *Reid*, 254 Conn. 540, 549, 757 A.2d 482 (2000) (testimony of criminologist regarding visible characteristics of and

similarities between strands of hair not "scientific evidence" for *Porter* purposes); *State* v. *Hasan*, supra, 205 Conn. 490 (testimony of podiatrist as to likelihood that certain pair of sneakers would fit on defendant's feet was not "scientific" evidence under *Frye*).

We previously have not addressed the question of whether narcotics field tests require a *Porter* hearing. In the case at hand, the defendant and the state agree that the testimony about the field test results is "scientific evidence" for *Porter* purposes. They disagree, however, as to whether the court correctly determined that the reliability of the methodology underlying the narcotics field tests is so well established that a formal *Porter* inquiry is rendered unnecessary. The defendant argues that Donawa's testimony regarding the results of the field tests should have undergone a *Porter* hearing because the state, as the proponent of the scientific evidence at issue, failed to establish the reliability or validity of the underlying scientific process involved in the field tests, and field tests are not generally accepted to conclusively prove a substance is a narcotic. The state responds that the field tests are not innovative scientific techniques and that they have been at least implicitly recognized as a reliable basis for legal purposes because testimony based on field test techniques has been admitted in our courts for decades, and also has been found sufficient, in part, to sustain probation violations and convictions.

We begin our analysis by recognizing our Supreme Court's admonition that there are "very few scientific principles [that] are so firmly established as to have attained the status of scientific law . . . [and] properly are subject to judicial notice," and are therefore excluded from the *Porter* standard. (Internal quotation marks omitted.) *Maher* v. *Quest Diagnostics, Inc.*, supra, 269 Conn. 169. Because we have not discovered

a definitive guidepost for determining whether a scientific principle is sufficiently well established to be admitted without a *Porter* inquiry, we look to the circumstances in which we have determined that certain scientific evidence is well established or does not involve novel scientific techniques so as to obviate the necessity of a *Porter* hearing. See id.[7]

In *State* v. *Legnani,* supra, 109 Conn. App. 419, this court held that "the defendant had failed to establish that tool mark identification evidence involved an 'innovative scientific technique' " and that, therefore, *Porter* did not apply. This court in *Legnani* relied on the trial court's consideration of testimony from the proffering expert that the scientific principles of ballistics and firearms analysis are well established and that the challenged testimony was simply a subset of that well established field. Id., 420–21. In *State* v. *Furbush,* 131 Conn. App. 733, 754, 27 A.3d 497 (2011), this court concluded that the testimony of two accident reconstructionists, explaining how a collision between two vehicles occurred, did not involve "innovative scientific techniques" requiring a *Porter* inquiry. In drawing this conclusion, this court considered the two experts' testimony that they applied "principles and theories that have been in the recognized literature and have been taught at training academies for decades" to determine where the collision occurred and how certain marks in the road were created. (Internal quotation marks omitted.) Id., 756. Finally, in *State* v. *Kirsch,*

---

[7] After our Supreme Court in *Maher* conducted a review of various cases in which our courts have determined that the reliability of a certain type of scientific evidence is well established, it noted that "[a]s these cases demonstrate, our exclusion of scientific evidence from the ambit of *Porter* when such evidence, and its underlying methodology, is 'well established' is reserved for those scientific principles that are considered so reliable within the relevant [scientific] community that there is little or no real debate as to their validity and it may be presumed as a matter of judicial notice." *Maher* v. *Quest Diagnostics, Inc.,* supra, 269 Conn. 172.

supra, 263 Conn. 405, our Supreme Court determined that a *Porter* hearing was unnecessary to determine whether a hospital blood test taken to measure the defendant's blood alcohol content was admissible because the reliability of the test was so well established. The Supreme Court relied on testimony of the director of the hospital's laboratories regarding the chemical process used in the test, leading treatises on scientific evidence indicating that the test is used universally and predominately as the method in clinical settings and cases from other jurisdictions concluding that the evidence was reliable. Id., 404–405. The guidance of these precedents is that, in reviewing the court's admission of the field test results in the present case, we may consider the testimony of the witness who offered the field test results, as well as the absence of any evidence concerning whether the validity of field tests has been accepted by the broader scientific field and whether other jurisdictions have subjected this evidence to analysis under *Daubert*.

We turn now to the specific question of whether the court erred in concluding that the reliability of field tests is well established. Here, unlike the situations in *Legnani, Furbush,* and *Kirsch,* there was no testimony regarding the scientific principles underlying the field tests or even regarding the broader scientific field of chemical analysis of narcotics from which the court could, or this court on review can, properly conclude that the scientific reliability of these tests has been well established. While Donawa testified to her training in administering the field tests, she also acknowledged that she could not explain the underlying chemical reaction except to state that the tests work by breaking the capsules containing "some sort of acidic liquid" inside the tube and confirming whether the resulting color the substance turns matches the color on the cap of the tube or box of the test. She further testified that the

tests can produce false positives and that it is the regular practice to send the items to be tested at the state laboratory by a toxicologist to be absolutely certain of the results. We note, as well, that the leading treatises on scientific evidence offer no clear consensus on the reliability of field tests. See 5 D. Faigman, M. Saks, J. Sanders, E. Cheng, Modern Scientific Evidence: The Law and Science of Expert Testimony (2011 Ed.) § 42:5, p. 555 (noting that there are very few reported opinions involving challenges to methods of drug testing not conducted by laboratory and that "[f]ield tests outside the laboratory would seem to be the most suspect form of testing").[8] We conclude, therefore, that Donawa's testimony provided an insufficient basis for the court's conclusion that the reliability of field tests was sufficiently established so that a *Porter* hearing on the admissibility of such tests was unnecessary.

The state argues, nevertheless, that the reliability of narcotics field tests is well established on the ground

---

[8] See also National Research Council, Strengthening Forensic Science in the United States, A Path Forward (2009) pp. 134–35, available at http://www.nap.edu/catalog.php?record id=12589 (last visited June 12, 2013) ("Most controlled substances are subjected first to a field test for presumptive identification. This is followed by gas chromatography-mass spectrometry (GC-MS), in which chromatography separates the drug from any diluents or excipients, and then mass spectrometry is used to identify the drug. This is the near universal test for identifying unknown substances."); A. Harris, "A Test of a Different Color: The Limited Value of Presumptive Field Drug Tests and Why That Value Demands their Exclusion from Trial," 40 Sw. L. Rev. 531, 544–47 (2011) (arguing that presumptive field tests on drugs have various reliability shortcomings recognized by forensic science community, and that, due to prejudice caused by these tests, courts should not admit them into trial); M. Blanchard & G. Chin, "Identifying the Enemy in the War on Drugs: A Critique of the Developing Rule Permitting Visual Identification of Indescript White Powder in Narcotics Prosecutions," 47 Am. U. L. Rev. 557, 584 (1998) (noting that "[t]here seems to be little doubt that a field test must be reliable to be admissible. Some courts have found positive field tests in and of themselves to be reliable and sufficient evidence for a jury to determine that a substance was a controlled substance. Others hold that field tests may be sufficient to arrest or charge, but cannot provide proof beyond a reasonable doubt.").

that their results have been admitted in our courts for decades and that field tests do not involve an innovative scientific technique. See *State* v. *Williams*, 169 Conn. 322, 332–33, 363 A.2d 72 (1975) (permitting testimony of police officer concerning narcotics field test results was not abuse of discretion because officer had "prior training and experience in the methods of field testing substances," and even if court's ruling was improper, it was harmless in view of subsequent testimony of toxicologist). We acknowledge the facial persuasiveness of the state's argument that the past acceptance in our courts of this evidence lends support to the court's conclusion that field tests are not innovative techniques requiring a *Porter* hearing. While it is pertinent to our analysis, however, that this evidence has been admitted in our courts previously, that does not conclude our analysis, especially because it appears that none of the defendants in those previous cases had challenged field test evidence on *Porter* grounds.[9]

[9] It is a reasonable, though not necessary, hypothesis, that few defendants have challenged this evidence previously because, in nearly all cases in which narcotics field tests have been admitted, there has been additional evidence of subsequent laboratory analysis confirming the presumptive field test. See, e.g., *State* v. *Lockman*, 169 Conn. 116, 118, 362 A.2d 920 (field tests on contents of glassine bag indicated that substance was heroin and analysis performed by state toxicological laboratory showed that substance was heroin), cert. denied, 423 U.S. 991, 96 S. Ct. 403, 46 L. Ed. 2d 309 (1975); *State* v. *Fair*, supra, 118 Conn. App. 360 (field test indicated aluminum packets contained phencyclidine and state toxicologist later confirmed packets contained phencyclidine); *State* v. *Barnes*, 27 Conn. App. 713, 715, 610 A.2d 689 (field test showed substance to be cocaine; packet further tested at toxicology laboratory and chief state toxicologist testified that contents of packet tested positive for cocaine), cert. denied, 223 Conn. 914, 614 A.2d 826 (1992).

In the few cases where it appears that the results of field test results were admitted without subsequent laboratory confirmation, it appears that the field test evidence was challenged on a sufficiency basis and not on the ground that the field tests were scientific evidence requiring a *Porter* hearing. For example, in *State* v. *Singleton*, 274 Conn. 426, 442, 876 A.2d 1 (2005), the defendant challenged the sufficiency of the evidence for the court to conclude that the defendant possessed crack cocaine and thereby violated his probation. On review, this court determined that the officer's field test

Although few courts in other jurisdictions have addressed the scientific reliability of narcotics field tests, the majority view appears to be that, to be admissible, field tests must meet reliability standards for scientific evidence. For example, in *State* v. *Morales*, 132 N.M. 146, 151, 45 P.3d 406 (2002), overruled on other grounds by *State* v. *Tollardo*, 275 P.3d 110, 121 n.6 (N.M. 2012), the Court of Appeals of New Mexico held, as a matter of first impression, that the *Daubert* standard applied to the admission of a drug field test when its results are to be used as evidence that the substance was in fact a narcotic. The New Mexico court held that where the police deputy could not explain the chemical reaction underlying the test and could not quantify the reliability of the test, the results were inadmissible because the state failed to meet its burden to establish scientific reliability. Id., 152.

Additionally, the Indiana Court of Appeals recently held that the state failed to show reliability of a field test of marijuana in order to establish the foundation for

of the substance was not sufficiently reliable to support a finding by a fair preponderance of the evidence that the hidden substance was in fact crack cocaine. *State* v. *Singleton*, 81 Conn. App. 409, 419, 840 A.2d 36 (2004), vacated, 274 Conn. 426, 876 A.2d 1 (2005). On further review, our Supreme Court dismissed the case on the ground of mootness but took the additional and infrequently employed measure of vacating this court's decision on the basis of its disagreement with this court's holding that the evidence of the field test, in conjunction with the corroborating evidence, was not sufficiently reliable to establish the nature of the substance by a preponderance of the evidence. *State* v. *Singleton*, supra, 274 Conn. 440–41. In vacating this court's decision, however, the Supreme Court specifically declined, to reach the question of whether a field test alone would be sufficient to establish, beyond a reasonable doubt, that the substance tested was crack cocaine. Id., 442; see also *State* v. *Synakorn*, 239 Conn. 427, 436, 685 A.2d 1123 (1996) (defendant challenged sufficiency of evidence for charge of possession of marijuana because state could not produce marijuana evidence at trial, and court held that jurors reasonably could have found, on basis of police officer's experience and testimony about field test results, that officer correctly identified plant-like substance found as marijuana packaged for sale).

a police officer to conduct a field test in the courtroom during trial on possession charges. *Doolin* v. *State*, 970 N.E.2d 785, 789 (Ind. App. 2012). The court concluded, however, that the officer's experience, training and personal observations, along with other circumstantial evidence, sufficiently established the identity of the substance as marijuana. Id., 790. Regarding the field test in the courtroom, the court found it significant that "although [the police deputy] provided a general overview of the several steps he intended to follow when conducting the test and stated that his department routinely utilizes the field test, he did not provide any specific name or otherwise identify the test, indicate its reliability or rate of accuracy or error, note the scientific principles on which it is based, or recognize any standards regarding its use and operation." Id., 789.[10] Coming to a contrary conclusion, the Georgia Court of Appeals, in *Fortune* v. *State*, 304 Ga. App. 294, 298–99, 696 S.E.2d 120 (2010), determined that chemical field tests of suspected narcotics was a scientific procedure that is not novel and has been widely accepted in Georgia courts and, therefore, was admissible without expert foundational testimony.

The state finally argues that the historical admission of narcotics field test results in our courts provides support for the court's conclusion that they do not involve an innovative scientific technique. The key to

---

[10] In *Commonwealth* v. *Fernandez*, 458 Mass. 137, 148–51, 934 N.E.2d 810 (2010), the Supreme Judicial Court of Massachusetts concluded that because the defendant raised the issue of scientific reliability of field tests at the "eleventh hour" and neither the state nor the judge ever characterized the tests as conclusive but rather emphasized their presumptive nature, it was not an abuse of discretion to accept the state's weak proffer that the field tests were sufficiently reliable for a limited purpose. The court also noted that there was no appellate case that had accepted as reliable field test results and until that occurred, field tests offered to prove identity of a substance must be evaluated according to *Daubert*. Id., 151 n.20.

our analysis, however, cannot be whether the *legal* sufficiency of field tests has been well established as probative, but whether, when challenged, the state has shown that the *scientific* reliability of the methodology used in the narcotics field tests is sufficiently well established so as to admit their results without first requiring the court to perform *Porter*'s gatekeeping inquiry. In the case at hand, the record discloses no testimony or other evidence to support the court's conclusion that the methodology used in the field tests is well established. Neither do we find a consensus among other jurisdictions or relevant scientific evidence treatises.

On the basis of our review of the record, and in accord with the majority of the jurisdictions that have addressed this issue, we conclude that the field tests results are based on scientific principles and, therefore, when challenged, they must comport with the principles of scientific reliability as set forth in *Porter*. Accordingly, we conclude that, on this record, the court abused its discretion in admitting this evidence without conducting a *Porter* hearing.[11]

## B

Having concluded that the court improperly determined that the reliability of the field tests is so well

[11] We point out that in reaching this conclusion, we do not decide whether the methodology of field tests is reliable under the *Porter* standard or whether, with the proper foundational testimony, field tests could be determined by the court to be so well established that a *Porter* hearing is unnecessary. We hold only that on the record before us we are unable to agree with the court's conclusion that the reliability of these tests is so well established that conducting a *Porter* hearing was unnecessary. It is on that basis, alone, that we conclude that admitting this evidence without a *Porter* hearing was an abuse of discretion. See *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 264, 9 A.3d 364 (2010) ("We do not, however, make a determination as to whether [the expert witness'] potential future testimony and conclusions ultimately may comport with the requirements of *Porter*. To the contrary, like the trial court, we have insufficient information about the methodology employed by [the expert witness] to enable us to reach such a decision."). We also note that the need to conduct this analysis will likely be infrequent, because,

established that a *Porter* hearing was unnecessary, we turn next to whether the court's admission of the field test evidence was nonetheless harmless error. "A court's failure to conduct a *Daubert* hearing properly has been subject to harmless error analysis . . . and we see no reason not to subject improprieties involving *Porter* to harmless error analysis." (Citations omitted.) *State* v. *Torres*, 85 Conn. App. 303, 328, 858 A.2d 776, cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004). "Where an evidentiary ruling has been found to be incorrect, but the improper ruling, as here, does not implicate a constitutional right of the defendant, the burden rests on the defendant to establish the harmfulness of the claimed impropriety. . . . In order to establish the harmfulness of a trial court ruling, the defendant must show that it is more probable than not that the improper action affected the result. . . . The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result?" (Citations omitted; internal quotation marks omitted.) *State* v. *Russo*, 62 Conn. App. 129, 135, 137–38, 773 A.2d 965 (2001) (testimony regarding field sobriety test using horizontal gaze nystagmus method is type of scientific evidence that must comport with *Daubert*, but improper admission of testimony of defendant's sobriety field test results harmless error).

In the present case, we do not conclude that the admission of the field test results affected the outcome of the defendant's trial. We are unpersuaded by the defendant's assertion, in brief, that the field test results were used to conclusively establish that the substances found in Nevarez' car were in fact drugs and that Nevarez obtained the drugs from the defendant. At trial, the court consistently and repeatedly stated that the

as in most cases previously, the state will produce the laboratory report confirming the presumptive field test results.

results of the field tests were not being admitted to prove the substantive charges of possession against the defendant. Although the court originally indicated that it would permit the results of the field tests to explain the officers' actions, the court later indicated, after the state's offer of proof, that the field test results were admissible because they were probative of the defendant's intent to sell. In its articulation on the motion in limine, the court indicated that "[t]he jury did not need to rely on field narcotics tests to determine that the drugs that the defendant possessed with intent to sell were actual narcotics," and "[t]he state's charges of possession with intent to sell were based on the drugs that were found on Ms. Vargas and, as the state alleged, constructively on the defendant." We agree with the court's characterization of this evidence. The defendant was not charged with constructive possession of the drugs in Nevarez' car, and without the field test results, the jury had other evidence regarding the defendant's behaviors at the bench from which it reasonably could have found that the defendant had constructive possession of the drugs on Vargas, with the intent to sell.

LaMaine testified regarding the suspicious movements of the defendant and Vargas. This evidence concerned their looking down at a common point in their laps and appearing to exchange something. LaMaine's belief in this regard was informed by his considerable experience investigating narcotics transactions. From this conduct and based on his experience, he formed the belief that the defendant and Vargas appeared to exchange something. There was also testimony that after the defendant exchanged something with Nevarez, Nevarez and Blakes then turned and walked back toward their vehicle and, as Nevarez walked, he inspected something in his hand, cupping it in one palm and poking it with his other finger, consistent, according to LaMaine, with an inspection of drugs. Furthermore,

there was testimony from Iamartino that when Nevarez noticed the police, he popped something into his mouth and swallowed it. There was also testimony regarding the crack pipe found in Nevarez' car. Additionally, as to the drugs that the defendant was actually charged with possessing, there was testimony from Grestini regarding the subsequent laboratory analysis performed on the drugs seized from Vargas confirming the presence of cocaine and heroin. Thus, although the field test results may have buttressed some of the jury's inferences about the evidence, we cannot conclude that, absent the field test testimony, the results of the defendant's trial would have been different. Therefore, we conclude that the court's improper admission of the field test results was harmless.

### III

The defendant's final claim is that the prosecutor made several improper arguments that deprived him of his due process rights to a fair trial. Specifically, the defendant argues that the prosecutor's claim during closing argument that no money was found on the defendant was improper because the court had suppressed evidence of $60 found on the defendant. The defendant further argues that the prosecutor also urged jurors to draw conclusions for which there was no evidentiary support. We agree with the defendant that the cumulative effect of these arguments deprived him of his due process rights to a fair trial.

The facts that underlie this claim are unusual. At the time of the defendant's arrest, $60 was found on his person, evidence of which was suppressed by the court in a pretrial motion. The court granted the defendant's motion to suppress the evidence of the $60 and ordered that "the $60 will not be the subject of testimony during the trial." The defendant additionally filed an amended motion in limine, requesting that in light of the court's

ruling granting the suppression of the money, the witnesses in the case should be precluded from characterizing any of the interactions between the defendant and suspects, other than Vargas, as " 'exchanges,' 'deals,' or 'transactions,' because each of those terms implied the exchange of money for drugs." In a colloquy with counsel during argument on the motion, the court stated that "the issue here is, you know, the motion to suppress has been won and it will keep the state from introducing any evidence whatsoever that they found any money on your client, and it permits you to argue they didn't find any money on him; the absence of a transaction." The court then reserved further arguments on the motion until the following day.[12]

The court denied the defendant's motion in limine and stated that "[t]he court's ruling suppressing the money does only that—it suppresses the evidence seized. . . . And the state cannot refer to the money that they seized from the defendant. And [defense counsel] and the defense are free to argue at closing that there was no evidence of money found on the defendant. The fact that the state cannot use the evidence of the money seized does not mean that the state can't introduce other evidence of exchanges in conduct between the parties as observed by the officers as evidence that the parties were engaged in a . . . transaction. The jury, if evidence is introduced, might find or

---

[12] The next day, defense counsel renewed her argument, and the court again addressed the limits to which defense counsel could refer to the lack of evidence of money found on the defendant:

"The Court: . . . But I think you can argue that no money was found on him at closing if there's no evidence; that you didn't hear evidence of any cash found on him.

"[Defense Counsel]: Exactly. And that—that's probably the furthest I could go with that because that's the actual state of affairs, that there was a legal operation here that kept—

"The Court: You didn't hear any evidence—

"[Defense Counsel]:—keeps—

"The Court: Right."

draw inferences supporting a finding of transactions. It of course will depend on the evidence."

With that factual underlayment, we turn now to consider the prosecutor's statements during closing argument that the defendant claims to be improper. During opening closing argument the prosecutor stated: "If you're gonna go into a park, the evidence would suggest that you're gonna go into a park and sell narcotics, or conspire to sell narcotics with intent to sell—have narcotics with intent to sell in a park. It is very logical that one of the first things you want to do if you were [the defendant] in a case like this is to make sure that the drugs are on your coconspirator and that the money is on your coconspirator. Now, when that prospective buyer, Nevarez, comes up, he goes—he goes to [the defendant]. And the reason he goes to [the defendant] and not Ms. Vargas is [that the defendant] is calling the shots." The prosecutor further argued a few moments later: "Now, one may say, well, why wasn't there any money found on [the defendant]? Well, if you're setting up an operation in a park, you want to make sure that the drugs and the money are found on the coconspirator; it makes sense. When the police moved in, they found it on the coconspirator. And that in essence is the state's case."

At the close of the prosecutor's argument, defense counsel requested a sidebar and objected to the prosecutor's reference during his closing argument to the defendant's not having been in possession of any money when the prosecutor stated, "why wasn't there any money found on [the defendant]?" Defense counsel further objected to the state's argument that because no money was found on the defendant, it meant that the defendant was involved in a conspiracy with Vargas, who was found with money. In response, the court offered to give an instruction to the jury, but defense counsel asserted that any instruction would potentially

hint that there was money found on the defendant. Defense counsel then moved for a mistrial. The court denied the defendant's motion for a mistrial, finding that it did not think that the argument "would prejudice the defendant in the totality of how the statements were made . . . ."

"To determine whether the court abused its discretion, we must determine whether prosecutorial impropriety deprived the defendant of a fair trial. [I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial [impropriety]." (Citation omitted; internal quotation marks omitted.) *State* v. *Fernandez*, 139 Conn. App. 341, 352, 55 A.3d 613 (2012), cert. denied, 307 Conn. 954, 58 A.3d 974 (2013).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper.

. . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . . A prosecutor must draw a careful line. On the one hand, he should be fair; he should. not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows. . . .

"It is well established, furthermore, that a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . .

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Jones*, 135 Conn. App. 788, 800–801, 44 A.3d 848, cert. denied, 305 Conn. 925, 47 A.3d 885 (2012).

With these principles in mind, we address each of the claimed improprieties in turn. The defendant first argues that when the state argued, "why wasn't there any money found on [the defendant]," it was violating the court's order suppressing the evidence of the money, as well as its subsequent rulings that the state and defense counsel could argue the absence of money on the defendant only by including the prefatory statement that "there was no evidence." The state maintains that the prosecutor did not violate the court's order but was instead following the court's instructions.

The state emphasizes two statements made by the court during colloquies with defense counsel on a motion in limine in which it stated that counsel could argue that the police "didn't find any money on him" and that "no money was found on the defendant." The state, however, takes these two statements out of context. The first statement was made during the court's preliminary discussion of the defendant's motion in

limine to preclude testimony of the police officer's characterization of the defendant's interactions as "exchanges, deals, or transactions." The court was not, at that time, addressing the constraints of counsel's closing arguments, which it did not address directly until the following day.

The second statement from the court that the state relies on fails to include the entirety of the court's statement. The court stated: "But I think you can argue that no money was found on him at closing *if there's no evidence*; that you *didn't hear evidence* of any cash found on him." (Emphasis added.) The state focuses on the first part of the court's statement but ignores the rest of the statement, which clearly instructed that counsel, in argument, could make reference that there was *no evidence* of money found on the defendant. Moreover, in its final ruling on the motion in limine, the court again emphasized that "the state cannot refer to the money that they seized from the defendant. And [defense counsel] and the defense are free to argue at closing that there was *no evidence* of money found on the defendant." (Emphasis added.)

The state responsibly acknowledges in its brief that when evidence is suppressed, "it is probably preferable to argue only that there was no evidence of the matter suppressed," but nonetheless argues that "the court here specifically allowed counsel to argue that no money was found on the defendant . . . ." While we do not agree with the state's argument that the court "specifically allowed counsel to argue that no money was found," we do recognize that the court's instructions to counsel could be fairly read as sending mixed signals regarding the extent to which counsel could refer to the absence of money being found on the defendant's person. We conclude, however, that, in consideration of all the court's remarks on this subject, as well

as the undisputed legal effect of suppressing the evidence of the money found on the defendant's person, we are left with the distinct impression that the court only intended to allow argument that there was no evidence of money found on the defendant and not, as argued by the state, that the defendant actually was not in possession of any funds. To reach a contrary conclusion would vitiate not only the intended effect of the court's suppression order but also its natural evidentiary import. Thus, we conclude, based on the record, that the prosecutor's argument that "no money was found on the defendant" falls outside the bounds of the permissible argument set by the court. "It is well settled that prosecutorial disobedience of a trial court order, even one that the prosecutor considers legally incorrect, constitutes improper conduct." (Internal quotation marks omitted.) *State* v. *McLaren*, 127 Conn. App. 70, 81, 15 A.3d 183 (2011).

Although we believe that the prosecutor's argument was improper, we do not conclude that the prosecutor was guilty of impropriety on the basis of these remarks alone. Thus, we turn now to address the defendant's second claim of impropriety, which is that the prosecutor argued facts that were not in evidence regarding the modus operandi of drug dealers. The defendant argues that the prosecutor's statements about the conspirators placing the drugs and cash on their coconspirator went beyond the facts in evidence to improperly argue facts that are not a matter of the jury's common knowledge and were properly the realm of expert testimony. We agree.

"We long have held that a prosecutor may not comment on evidence that is not a part of the record and may not comment unfairly on the evidence in the record." *State* v. *Fauci*, 282 Conn. 23, 49, 917 A.2d 978 (2007). In the present case, a review of the record demonstrates that there was no evidentiary support for the

prosecutor's argument that conspirators who traffic in drugs are known to place the drugs and cash on their coconspirator. In support of its closing argument in this regard, the state asserts that it was arguing reasonable, logical inferences from the evidence and that there is no requirement that expert testimony regarding drug sales must be introduced before the state can suggest reasonable inferences from the evidence of a sale that was presented. We agree with the state that "[a]rgument is proper if the jury reasonably could draw such conclusions on the basis of the evidence presented at trial. . . . Argument is improper [however] if the prosecutor draws conclusions for which there is no evidentiary support." (Citation omitted.) *State* v. *Collazo*, 113 Conn. App. 651, 673, 967 A.2d 597 (2009). The state acknowledges in its brief that "[i]t is true that there was no expert testimony on this issue either way, i.e., whether dealers do or do not keep drugs and/or money on conspirators." The state failed to elicit evidence from any of its several experts in narcotics trafficking that it is common practice for drug dealers to have the incriminating evidence of drugs and money held by a coconspirator. See, e.g., *State* v. *Francis*, 90 Conn. App. 676, 682–83, 879 A.2d 457 (expert testimony that "drug dealers often will stash their drugs in a hidden location so that if they are stopped by the police, they can claim that they are not in possession of drugs"), cert. denied, 275 Conn. 925, 883 A.2d 1248 (2005); *State* v. *Waden*, 84 Conn. App. 147, 153–54, 852 A.2d 817 ("the state presented expert testimony that it is common for a street level drug dealer to keep a 'stash' of narcotics in an area close to where he is selling, rather than have a significant quantity on his person"), cert. denied, 271 Conn. 916, 859 A.2d 574 (2004). It was, therefore, improper for the prosecutor to argue this inference to the jury without such evidentiary support. Additionally, the prosecutor's statements that no money was found

on the defendant's person, and that the reason the defendant did not have any money was typical behavior of drug dealers undermined the court's suppression order. Thus, although either statement alone may not have established impropriety, we must consider whether the cumulative effect of both the statements deprived the defendant of his right to a fair trial. See, e.g., *State* v. *Jordan,* 117 Conn. App. 160, 163, 978 A.2d 150, cert. denied, 294 Conn. 904, 982 A.2d 648 (2009).

B

"[W]e now turn to the ultimate question, which is whether the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . This inquiry is guided by an examination of the following [*State* v. *Williams,* 204 Conn. 523, 535–40, 529 A.2d 653 (1987)] factors: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Warholic,* 278 Conn. 354, 396, 897 A.2d 569 (2006).

Our review of the *Williams* factors leads us to conclude that the defendant's conviction was a denial of

due process. The prosecutorial improprieties were not invited by the arguments of defense counsel, which the state concedes. Instead, as discussed previously, the prosecutor's statement that no money was found on the defendant's person was in response to various court rulings regarding the extent to which the defense and the state could refer to the absence of evidence of money. At the very least, the prosecutor skirted the court's order by failing to state that there was *no evidence* of money. Moreover, the two statements, in conjunction with one another, compounded both the frequency and severity of the improprieties, especially in light of the relatively brief closing argument and the limited amount of evidence that the prosecutor could highlight in his closing argument.

Further, the statements went to the central issue of the case, whether the state could prove that the defendant had dominion and control over the drugs found on Vargas' person and whether he was engaged in a conspiracy with her. Also, defense counsel objected to the statements at trial. While the court did offer a curative instruction, defense counsel determined that any instruction would draw the statements to the jury's attention and further hint of the suppressed evidence, and, instead moved for a mistrial. Finally, the state's case was not very strong. The evidence connecting the defendant to the drugs found on Vargas' person consisted largely of circumstantial evidence based upon LaMaine's observations of the defendant's movements on the park bench from a sufficient distance that he used binoculars to make his observations. Although we concluded that the jury was able to make reasonable inferences to support its conclusions without resorting to improper speculation, "the state's case was not sufficiently strong so as to not be overshadowed by the impropriety." *State* v. *Angel T.*, 292 Conn. 262, 293, 973 A.2d 1207 (2009).

To summarize, the prosecutorial improprieties were not invited by defense counsel and were objected to when they occurred. No curative measure could be employed that would adequately remedy the improprieties. Although the remarks occurred only once, the state's case was not strong and the improprieties went to the heart of the case. Accordingly, we conclude that the defendant has demonstrated that there was impropriety and that it resulted in the deprivation of his right to a fair trial.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

