LAWSON, C.J.
Marquis L. Bell, Jr., appeals his adjudication for violation of probation. We affirm the trial court’s finding that Bell violated his probation by possessing illicit drugs based upon this court’s precedent in Terry v. State, 777 So.2d 1093 (Fla. 5th DCA 2001), which held that a probation officer’s testimony regarding positive results of an on-site or “field” drug test that the officer personally conducted, along with hearsay evidence from a positive laboratory test on the same urine sample, constituted competent, substantial evidence sufficient to support a finding that the defendant violated his or her probation by using or possessing drugs. As to this issue, we certify that our decision conflicts with Queior v. State, 157 So.3d 370, 373 (Fla. 2d DCA 2015), rev. granted, No. SC15-367, 2015 WL 1894002 (Fla. April 14, 2015) and Dawson v. State, 40 Fla. L. Weekly D1683, 2015 WL 4464695 (Fla. 1st DCA July 21, 2015).
We reverse the trial court’s finding that Bell violated - his probation by associating with persons engaged in criminal activity because this ground was not alleged in the violation affidavit. See Manis v. State, 30 So.3d 586 (Fla. 5th DCA 2010). Because it is clear from this record that the trial court would have revoked Bell’s probation and imposed the same sentence based solely upon Bell’s possession of illicit drugs, no further proceedings are re; quired. See, e.g., Crapps v. State, 155 So.3d 1242, 1247 (Fla. 4th DCA 2015) (“[Wje.will affirm a revocation of probation based on both proper and improper grounds only when it is clear from the record that the trial court would have revoked the defendant’s probation absent the improper grounds.”).
We write further to explain why we believe that Terry was decided correctly. First, we will discuss the different eviden-tiary standards that apply to violation of probation hearings. Second, we will discuss the significance of a drug use/drug possession violation and the evidence typically relied upon by the state to prove the violation. Third, we will discuss the conflict cases, both (1) what we view as a mistake in classifying evidence that may have led our sister appellate courts to reach a different result and (2) what appears to be a more restrictive application of evidentiary rules than should apply in VOP hearings, which may be a second reason for the departure from Terry. Finally, we will explain why we believe that the trial court correctly admitted the evidence relied upon bj| the State to prove the violation in this case, and why that evidence was sufficient to support the trial court’s finding that Bell violated his probation.

Unique Evidentiary Standards Apply To VOP Hearings

It is well established that “[probation is an act of grace to a- defendant convicted of a crime.” Peraza v. Bradshaw, 966 So.2d 504, 505 (Fla. 4th DCA 2007). Because a probationer has already been afforded the full panoply of constitutional protections guaranteed by the Constitution to an accused individual prior to his or her conviction, “[w]hen a defendant violates probation, that defendant is not in the same position as a defendant arrested for the commission of a crime for which he or she is deemed innocent until' proven guilty beyond a reasonable doubt.” Id. As a matter of “grace ... [probation is also] subject to the trial court’s discretion.” Saidi v. State, 845 So.2d 1022, 1028 (Fla. 5th DCA 2003). Because of these principles: - '
A probation revocation hearing is more informal, the charging affidavit need not comply with the requirements indictments and informations must meet, the *352 strict rules- of evidence cm be deviated 'from, and the admission of [otherwise inadmissible] hearsay [as substantive evidence] is not error. Furthermore, there is a lesser burden of proof because only the conscience of the court must be satisfied.
Cuciak v. State, 410 So.2d 916, 918 (Fla.1082) (emphasis added). Even with these relaxed rules, however, findings in a violation of probation hearing cannot be based solely on hearsay that could not be admitted as substantive evidence in other proceedings. See, e.g., McDoughall v, State, 133 So.3d 1097, 1099 (Fla. 4th DCA 2014). Rather, “[the hearsay must be corroborated by non-hearsay.]’ Id. (citing J.F. v. State, 889 So.2d 180, 131-32 (Fla. 4th DOA 2004)).

The Drug Use/Possession Violation In General

It is worth noting that probation revocation for the use or possession of illegal drugs is one of the more frequent violations that we see, probably because (1) the violation can be detected with relatively inexpensive drug testing conducted during one of the probationer’s, routine. appointments at the probation office; and (2) the state does not have: the. resources to monitor the 'conduct of probationers through rigorous - or frequent field investigations. Consequently, the evidence necessary to prove this violation is of particular statewide significance.
The state regularly seeks 'to prove this violation primarily by calling the probation officer to testify regarding the general conditions of probation, to identify the probationer, and to explain that the probationer was instructed on the relevant conditions of probation. The probation officer then explains what he or she did and observed when collecting the urine sample from the defendant and administering the presumptive “field” test, along with his or her personal observation of the test’s positive indication of drug use. Eviden.ce regarding this , initial stage of drug testing is routine and ubiquitous, such that judges throughout the state (i.e., the fact-finders in VOP proceedings) are well-versed in the procedure. .And, studies have proven the results of these tests to be highly reliable, even when the test is not administered by a trained laboratory analyst. For example, in 2000 the National Highway Traffic Safety Administration (“NHTSA”) released a study of different field drug tests used by various law enforcement agencies. The NHTSA concluded in its final report that the overall error rates were a low 2.5% when the tests were administered by officers and an even lower 0.8% when administered by trained laboratory technicians. National Highway Traffic Safety Administration, ■ Field Test of On-Site Drug Detection Devices, Final Report, October 2000, http://www.nhtsa.gov/people/ injury/research/pub/onsite-detection/ ■ Drugs — Ch5.htm.
. In 2004, the Substance Abuse and Mental Health Services Administration reported that on-site or field “urine testing ha[s] been subjected to evaluations by investigators independent of the manufacturers and found to perform similar to that of the instrumented immunoassay tests[1] in *353 certified laboratories.” . 1 Drug Testing Law Tech. & Prac. § 5:5 “On-site Drug Testing,” (quoting Substance Abuse and Mental Health Services Administration, “Proposed Revisions to the Mandatory Guidelines for Federal Workplace Drug Testing Programs,” (April 18, 2004)). The Administration further concluded that “[l]ittle difference in the performance of these devices was observed between tests conducted by laboratory technicians and laymen who had been trained in the proper procedures for conducting and reading the tests.” Id.; see also Adkins v. T.C. Martin, 699 F.Supp. 1510, 1513 (W.D.Okl.1988) (“It has been authoritatively determined that the immunoassay test is 95 per cent accurate, it is the most widely used and reliable method of laboratory medicine in the world, and forms a sufficient basis for disciplinary action that does not violate due process. It is sufficiently reliable even if it is the only evidence in a parole revocation hearing.”),
Although this testimony obviously meets the foundational test for admissibility, see § 90.402, Fla. Stat. (2014) (“All relevant evidence is admissible, except as provided by law.”); 28A C.J.S. Drugs and Narcotics 8 390 (“The results of field tests, laboratory tests, and urinalysis tests are relevant in criminal drug prosecutions”), states differ in their rulings on whether and under what circumstances the results of “presumptive” field tests can be admitted in criminal jury trials. Compare, e.g., Fortune v. State, 304 Ga.App. 294, 696 S.E.2d 120 (2010) (holding that chemical field tests of suspected narcotics were scientific procedures that had been so widely accepted in Georgia courts that they were admissible in criminal jury trials without expert foundational testimony), with State v. Martinez, 143 Conn.App. 541, 69 A.3d 975 (2013) (disagreeing with Fortune and holding that a police officer could not testify to the results of a presumptive field test absent. a sufficient evidentiary foundation testified to by a scientific expert). However, given the well-settled rule that “the strict rules of evidence can be deviated from” in probation revocation proceedings, Cuciak, 410 So.2d at 918, Florida courts seemed to have generally accepted that the probation officer who. conducted the presumptive drug test could testify.to ⅛6 results at the VOP hearing, so long as the officer had the training or experience necessary to understand the test and interpret the results. See Terry, 777 So.2d at 1094; Carter v. State, 82 So.3d 993 (Fla. 1st DCA 2011) (distinguishing Terry where probation officer testifying to test results “gave no indication that he was certified to administer the test, or had in fact administered it with any frequency”); Weaver v. State, 543 So.2d 443 (Fla. 3d DCA 1989) (holding that the officer’s testimony about the field test results, standing alone, could not support the finding of a violation where the officer did not even know the name of the field test or that it was reliable). There is at least one reported opinion finding that a positive drug screfening test result, testified to by the probation officer who conducted the test, is sufficient to support a trial judge’s finding that the defendant violated probation by using illicit drugs — even without any confirmatory lab testing. See Hall v. State, 681 So.2d 251 (Ala.Crim.App.1996). In Hall, the probation officer had received a one-day training course in administering the test, and testified that the manufacturer reported that the test was accurate 99% of the *354 time. Id. at 251. In that case, the state also introduced, as an exhibit, an article describing the testing system used. Id. at 252.
In Florida, however, the Department of Corrections appears to always confirm the result of the field test by sending the sample to a laboratory for independent testing (using an even more accurate and sophisticated technology). This is clearly the better and more widely accepted practice. See Cathryn Jo Rosen, The Fourth Amendment Implications of Urine Testing for Evidence of Drug Use in Probation, 55 Brook. L. Rev. 1159, 1167-68 (1990) (“Professionals in the field generally recommend that screening test results be confirmed through the use of (gas chromatography/mass spectrometry] or one of the other confirmatory techniques in situations in which positive test results ‘have an impact on the life, liberty, property, reputation, or employment of the person being tested.’ ” (quoting Council on Scientific Affairs, Scientific Issues in Drug Testing, 257 JAMA 3110, n. 24 (1987))). Of course, “confirmatory tests are expensive[,]” which is why “in some jurisdictions, probation officers, have sought to revoke probation on the basis of either a single, unconfirmed [screening] test, or a second, ‘confirmatory,’ [screening] test using the same method on. the .same urine sample.” Rosen, Supra, at 1168.
Although Florida incurs the cost of independent laboratory testing when an on-site test indicates the use of -illicit drugs, our State has not historically incurred the additional cost to subpoena the chemist or laboratory analyst who conducted the independent laboratory test as a witness for the violation of probation hearing.[2] Rather, the lab report is introduced as hearsay, which (as already discussed) is admissible in a violation of probation hearing.[3] This procedure seems to be prevalent in other jurisdictions as well. See, e.g,, United States v. Bell, 785 F.2d 640, 643 (8th Cir. *355 1986) (“The urinalysis laboratory reports bear substantial indicia of reliability. They are the regular reports of a company whose business it is to conduct such tests, and which expects its clients to act on the basis of its 'reports. Moreover, we note that no evidence was presented to contradict [defendant’s] drug usage, and that [defendant] has made only general, unsubstantiated claims that the laboratory tests may have been defective. We conclude that under these circumstances there was good cause to permit the government to avoid the difficulty and expense of bringing the chemist or chemists who performed the tests from California- to Arkansas to testify.” (internal citation omitted))[4] ; Harris v. United States, 612 A.2d 198, 202 (D.C.1992) (“We are not persuaded that the trial judge erred when he concluded that the government need not provide a witness who had personal knowledge of the three positive drug tests and who could testify to the reliability of the results. Probation and parole revocation hearings are not trials; the formal rules of evidence do not apply. Consequently, evidence that would be inadmissible at trial may be admissible at a probation or parole revocation hearing. We are satisfied that in the context of a probation revocation hearing, the [lab] ADASA report qualified as sufficiently reliable prima facie evidence that appellant had tested positive for illegal drug use.” (internal citations omitted)).
We have found no other cases, aside, from the Florida conflict cases which we will discuss next, holding that direct testimony from a probation officer who conducted the positive on-site drug test, confirmed by a report from an independent laboratory, is insufficient to meet the relaxed burden of proving a probation violation.

The Conflict Cases'

In Dawson, recently decided by the First District, the state relied upon the typical evidence discussed above to prove that the defendant violated probation by using illicit drugs. As explained in Dawson, the probation. officer testified “that she conducted ¿.’urinalysis at her office that indicated appellant used cocaine, and then she sent a urine sample to a laboratory' which issued a report indicating the urine tested positive for cocaine.” Dawson, 2015 WL 4464695 at *1. The panel first concluded that the laboratory report was hearsay, id., a proposition with which we do not disagree. But, the panei also held that the probation officer’s testimony constituted hearsay, concluding that' “[b]e-cause the State’s evidence consisted'entirely of hearsay[,] the revocation order had to be reversed.” The Dawson panel did not analyze either evidentiary issue independently, but cited a single prior panel decision from its court as the authority for each hearsay conclusion. The panel cited Bray v. State, 75 So.3d 749 (Fla. 1st DCA 2011) for its conclusion that the probation officer’s testimony constituted hearsay.
Bray does not analyze the question either, but declares the testimony to be hearsay based upon that panel’s reading of L.R. v. State, 557 So.2d 121 (Fla. 3d *356 DCA 1990) and Weaver, 543 So.2d 443. L.R. is not a VOP case, and more significantly, does not even mention hearsay. • In Weaver, as already discussed, the Third District Court of Appeal concluded that the probation officer’s testimony was insufficient to support a finding of drug use where the officer did not testify to his training or experience in conducting the test, had"'no knowledge of whether the'test was reliable, and did not even know the name of the test. But, the Third District Court of Appeal properly characterized the probation officer’s testimony as “non-hearsay.” See id. at 443. (“Nevertheless, the only non-hearsay evidence introduced into the record showing that the white substance delivered to the undercover agents was, in fact, heroin, was the testimony of Agent Brinson who said he conducted a field test oh the substance shortly after it was delivered.” (emphasis added)). We have no explanation for how the Bray panel could have read Weaver or L.R. as concluding that the in-court testimony of a probation officer about his or her personal observations constitutes hearsay. It is not.
Hearsay “is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. See § 90.801(1)(c), Fla. Stat. (2014) (emphasis added), “A ‘declarant’ is a person who makes a statement.” See § 90.801(1)(b), Fla. Stat. (2014). In Dawson, the officer (the “declarant”) was testifying at hearing, subject to cross-examination, to what she personally did and observed. This is classic non-hearsay testimony. And, clearly, the drug test is not a “declarant” capable of uttering hearsay. See id. (“A ‘declarant’, is a person —” (emphasis added)). So, if there is a problem with the testimony, it is not — as the Dawson panel stated, citing Bray — that the testimony is hearsay.
Bray was also cited without question for the erroneous conclusion that a probation officer’s testimony regarding the result of a field test is hearsay in Rothe v. State, 76 So.3d 1010 (Fla. 1st DCA 2011). Additionally, the Second District Court of Appeal positively cited Bray in support-of its ultimate conclusion “that Mr. Miller’s testimony ahout the field test results was not competent, nonhearsay evidence that Mr. Queior had used an opiate in violation of his probation.” Queior, 157 So.3d at 374 (emphasis added).' So, it is possible that, like the First District, the Second District has also erroneously concluded that the probation officer’s testimony regarding the field test is hearsay. But, Queior is unclear, and could also be read as holding that because the probation officer in that case was not a chemist who could give expert testimony sufficient to explain the science behind the test or render an independent expert opinion regarding its reliability, his testimony was not competent. We disagree.
First, because of the ubiquitous nature of this type of testimony in this context, we question whether a probation officer needs to first be qualified as an expert before being allowed to testify to the test results. See Fortune, 696 S.E.2d at 123-24 (allowing lay testimony regarding positive field test results where the judge took judicial notice “that the chemical field test... was a procedure or technique that had been established with verifiable certainty”). Given the context, i.e., the relaxed rules of evidence with the judge as a trier of fact, we view the probation officer’s testimony as > similar to & lay witness, testifying in court, who states that he saw the traffic signal immediately before an intersection crash and that the light was green when the plaintiff entered the intersection. No one would argue that this in-court testimony constitutes hearsay. Nor would wo *357 require that the witness be an electrical engineer who can testify to details of how a traffic signal operates (or rénder an opinion that the signal in question was operating properly on the day that the witness made his or her observation). We then allow the jury to infer from their common knowledge of the ubiquitous traffic signal that if the signal in one direction was green, the signal in the other direction was not.'
We also believe that the typical probation officer field test testimony should qualify for admission, at least at a probation hearing, as expert testimony. As explained in Chavez v. State, 12 So.3d 199, 205 (Fla.2009), it “is within the court’s discretion to determine the qualifications of a witness to express an expert opinion, and this determination will not be reversed absent a clear showing of error.” The court noted that the prior version of section 90.702, Florida Statutes; “requires the court to make two preliminary determinations: (1) whether the subject matter, will assist the trier of fact in understanding the evidence or in determining a disputed fact, and (2) . whether the witness is adequately qualified to express an opinion on the matter.” Chavez, 12 So.3d at 205 (citing Huck v. State, 881 So.2d 1137, 1149 (Fla. 5th DGA 2004)).[5] No one would argue that the probation officer’s testimony (that what he or she observed when viewing the field test meant that the defendant tested positive for an illicit substance) would not assist the trier of fact in determining whether a probationer used or possessed the illicit substance. The real question is whether the witness is qualified to interpret the test. The level of training or amount of experience necessary to qualify as an expert, of course, depends wholly on the subject of the testimony. 31A Am. Jur.2d Expert and Opinion Evidence § 38 (“Accordingly, the admissibility of expert testimony is dependent on the expert witness being qualified to testify-as an expert or, in other words, qualified to testify, competently regarding the matters that he or she intends to address.”). Additionally, the evidence code “does not mandate that an expert be highly qualified in order to testify about a given .issue” because '“[differences in expertise bear chiefly on the weight to be assigned to the testimony ,.. not its .admissibility.” Huss v. Gayden, 571 F.3d 442, 452 (5th Cir.2009) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). So, the question,, then, is what level of training or experience is necessary before a person can reliably interpret these preliminary drug tests. As already discussed, the relevant literature confirms the answer to be “very little.” This is because these tests .are designed to be simple to use and understand, with minimal training. So, assuming that the result of one of these presumptive tests would be relevant and otherwise admissible under the rules of evidence, we believe that any person .with the minimal training,, experience, or both, needed to understand these tests and how to read and explain their results would qualify to testify to the results under section 90.702, Florida Statutes. To the extent that this would even be a close question under section 90.702, it should not be a question at all in a probation violation hearing where “the strict rulés of evidence can be deviated from.” Cuciak, 410 So.2d at 918. As such, if the result in Queior was driven by a conclusion that the probation officer’s test result testimony should not have been admitted be *358 cause a non-chemist probation officer is not “competent” to explain the results under section 90.702, -we conclude that the Queior panel at a minimum erred by rigidly applying the rules of evidence to a VOP hearing in violation of the Supreme Court’s direction in Cuciak:

This Case

Turning to the evidence in this case, we find no abuse of discretion in the admission of the probation officer’s testimony regarding the results of the presumptive field test that the officer conducted on a urine specimen submitted to him by Bell at the probation office on March 4, 2014. The sample tested positive for “marijuana metabolite.” The officer was certified to administer the test and had fifteen years-'of experience in administering field tests. The officer also testified to the positive results from an independent laboratory, Alere Toxicology Services, Inc.', which confirmed Bell’s use of marijuana. Because the’ hearsay evidence regarding the independent ‘confirmatory test was corroborated by the probation officer’s non-hearsay testimony regarding his field test results, we find no abuse of discretion in the trial court’s finding that Bell violated his probation 'as'alleged, based upon this evidence. We certify that this conclusion conflicts with Dawson and Queior. We also certify conflict with Bray, on which the Dawson panel relied' to reach its result, and with Rothe, the other First District case which followed Bray.
AFFIRMED IN PART; REVERSED IN PART; CONFLICT CERTIFIED.
COHEN and EDWARDS, JJ., concur.

. An immunoassay test or, more properly "immunochemical assay” test, detects. a "drug or its metabolites in the urine” because the substance acts as “an ‘antigen,’ combining with antibodies to the drug to form antigen-antibody complexes that can be detected" by a substance used in the laboratory or drug testing kit. Zeese, Drag Testing Legal Manual § 2:23 (2d ed,), “There are three basic types of immunoassays: enzyme immunoas-says, radio immunoassays, and fluorescent immunoassays.” Id. "Immunoassays have been in existence since the 1950s and have been used to analyze biological fluids for low *353 levels of enzymes, hormones, and drugs. The assay technique was first applied to morphine in the early 1970s,” Id. Today, "[t]hese are the most widely used screening tests because they are quick, inexpensive, aggressively marketed, and adept at weeding out negative samples.” Id.

. We also have experience with lab analysts testifying in criminal jury trials, usually to confirm that they tested a substance at one time possessed by the defendant. In our experience, these experts test many substances submitted by many law enforcement agencies relating to many different cases, each day. As a practical matter, by, the time of trial or hearing they have no specific memory of conducting the test about which they are testifying and rely on the report: ’ Because section 90.803(5), Florida Statutes, allows the state to permit the lab analyst to read portions of the written ¡report into the record as substantive evidence, the state is able to admit the test results so long as the analyst is in court to lay the proper foundation for a "recorded recollection” (or uses the written report to "refresh” his or her memory). Of course, this means that the testimony of the analyst ends up being no more or less helpful (for either party or the trier of fact), than the report itself. Because of this reality, an evidentiary ruling that would require the state to begin calling laboratory analysts at VOP hearings in order to introduce the report would greatly increase the cost of supervising probationers with no real increased benefit for either party or the court in terms of the quality of information available to the trial judge' when exercising his or her. discretion at a VOP hearing.

. We note that in some jurisdictions, these reports were admitted in criminal jury trials prior to Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), pursuant to the business records exception. See United States v. Frattini, 501 F.2d 1234 (2d Cir.1974) (results of chemical analysis of controlled substance’admissible as business record); United States v. Ware, 247 F.2d 698 (7th Cir.1957) (results of chemical analysis of controlled substance admissible as business record); Coulter v. State, 494 S.W.2d 876 (Tex.Cr.App.1973) (chemist's report of results of analysis of controlled substance admitted as business record without violating Confrontation Clause); see also Howard v. United States, 473 A.2d 835 (D.C.1984) (chemist's drug analysis reports properly admitted pursuant to business records exception) superseded by Crawford as recognized in Thomas v. United States, 914 A.2d 1, 5 (D.C.2006).

. In Bell, the Eighth Circuit expressly held that introducing a urinalysis lab report at a violation of probation hearing, without calling the laboratory analyst as a.witness, did not violate a defendant’s Sixth Amendment right to confront and cross-examine witnesses. The Florida Supreme Court has also held that introducing otherwise inadmissible hearsay evidence at a violation of probation hearing does not violate a defendant’s Sixth Amendment right. Russell v. State, 982 So.2d 642, (Fla.2008) ("[R]evocation of probation or community control proceedings are not criminal prosecutions and therefore Crawford [v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)] does not apply to revocation proceedings ... ”).

. Although section 90.702, Florida Statutes was significantly amended in 2013 to adopt the federal standard for admitting export testimony, it retains these preliminary determinations. See § 90.702, Fla. Stat. (2014).